Mr. Chief Justice Johnson delivered the opinion of the Court. The iirst position, taken upon the motion in arrest, is, that the act, upon which the indictment was founded, is unconstitutional and void. The constitution provides that any slave who shall be convicted of a capital offence, shall suffer the same degree of punishment as would be inflicted on a free white person, and no other. It is contended that the proper construction of this constitutional provision is, that the legislature cannot declare that a negro shall be hung for an offence, when a white man, for the same offence, is only punished by imprisonment. It is conceded, by the counsel for the accused, that the legislature possesses the power to make an act criminal in a slave, which would not be so in a white man; but then he insists that, as to acts or of-fences, which are common to both and made criminal in both, a slave cannot be hung, when for the same offence, a white man would only be imprisoned. We cannot concur in the construction claimed for the constitutional provision referred to; but, on the contrary, are fully persuaded that it is not in accordance with the spirit and intention of that instrument. If the offence charged against the appellant had been declared capital, whether committed by a white man or a negro, but that, in the case of the former, the mode of execution should be by hanging by the neck, whereas the latter should be first scourged, and then burned, and finally destroyed by hanging, there can be no doubt but that such act would be unconstitutional and consequently void. The provision was doubtless inserted in the constitution from a feeling of humanity towards the unfortunate African, race, and in order to secure them against that barbarous treatment and excessive cruelty which was practiced upon them in the earlier period of our colonial history. It was not thought fit, in these enlightened times, to continue the practice of those barbarities which were superadded to -actual destruction of life by our less enlightened and more unfeeling ancestors. It is true, as contended, that the law-making power is not restricted to any particular modo of inflicting capital punishment, and it is equally undeniable that, in case they should see proper to declare that a white man guilty of a capital offence should be burned or beheaded, they could direct that a negro, who should be found guilty of any crime made capital, Should be executed in the same manner, and no other. It is urged that capital punishment does not admit of degrees, and that therefore the constitution did not intend to use the term “degree” as synonymous with “mode” or “manner.” We think that, in view of the great evil that the proviso under discussion was designed to remedy, the term “degree” was properly adopted, and that no word in the English language could more forcibly convey the idea intended. Capital punishment is not necessarily instantaneous, but may be effected by a system of steps or degrees rising by regular gradations from the mildest possible infliction to the very point of death itself. We think it clear, therefore, that all that was designed to be understood by the provision in the constitution was that, in case a negro should be convicted of a capital crime, he should not undergo other or greater punishment than that which should be inflicted upon a white man for an offence which would subject him to capital punishment. The second point made upon the motion in arrest is, that, inasmuch as a negro is only punishable capitally for an attempt upon a white woman, the two first counts in the indictment are insufficient in law. The section of the statute upon which the indictment was framed, first defines rape to be the carnal knowledge of a female forcibly and against her will, and then declares that any person convicted of the crime of rape shall suffer the punishment of death; and the 8d section also declares that “ Every person, who shall, with the intent to commit a rape, administer to any female any potion, substance or liquid, with intent to produce such sleep or imbecility of mind or weakness of body as to prevent effectual resistance, shall, upon conviction, be punished with death;” and the 6th further provides that “ Every person who shall take unlawfully, and against her will, any woman, and, by force, duress, or menace, compel her to marry him, or to marry any other person, or to be defiled, such offender shall suffer death.” These sections contain all the capital offences enumerated by the statute. The 9th section then declares that “ If any negro or mulatto shall commit any of the before enumerated offences which are punished with death, or shall commit the infamous crime against nature, either with man or beast, he shall be punished with death; and if such negro or mulatto shall attempt any of such offences, although he may not succeed, on a white woman, he shall suffer death on conviction thereof.” The argument upon this branch of the case is, that, since the 4th section has made provision for the punishment of the carnal knowledge or unlawful abuse of female children under the age of puberty by imprisonment, and that as the 9th sec. only punishes the attempt upon a white woman, that a girl is not within the protection of the latter statute. We cannot admit the correctness, of this doctrine. So far from there being any conflict between the 4th and 9th sections, we consider that they both stand upon an entirely separate and independent basis, and that they have not the slightest connection with each other. It would be a little remarkable that a female child should not be the subject of rape merely because the law has seen fit to protect her from personal injuries, which do not rise to the grade of that offence. The 4th section was doubtless designed alone to protect young females under the age of puberty against the effects of their own indiscretion arising from their tender years and inexperience in the affairs of the world. The terms “carnally knowing” and “abusing unlawfully,” do not contemplate actual force or the absence of the will, but that although no force be used and she yield her consent, yet, she being under the age of puberty, she is incapable of consenting. The law under such circumstances, though it will not visit upon the offender all the terrible consequences incident to the crime of forcible rape; yet, inasmuch as the female is not regarded as capable of consenting, the act is made criminal, and the guilty party consigned to the penitentiary. By the statute of 18 Elibabeth, (sec. 7,) the offence of carnally knowing and abusing any woman child under the age of ten years, was made felonj1' without benefit of clergy; in which case, the consent or non-consent was held to be immaterial, as by reason of her tender years she was supposed to be incapable of judgment and discretion. (See 4 Bl. Com. p. 260.) Our statute has not, like that of Elizabeth, fixed a particular period as the precise time when a female is supposed capable of consenting: but on the contrary, for some reason, placed it at the age or time of puberty. It never was supposed that the statute of Elizabeth was designed to diminish the protection of the law over infants under ten years : but that, on the contrary, it was intended to enlarge that protection by furnishing additional safeguards to their chastity and virtue. Our statute cannot, with propriety, receive any other construction. The evil against which it was intended to provide was, that corrupt and designing men would practice upon their ignorance and indiscretion to obtain their consent, and then, when charged with the crime of rape, plead such consent in their defence, and thereby succeed in their nefarious purposes without subjecting themselves to the penalty denounced against the crime of rape. This extension of the remedy was, therefore, absolutely necessary in order to protect the persons of young females against the fatal consequences of their own indiscretion, and also to discourage the commission of such abominable and detestable crimes. The 4th section of our statute was, therefore, aimed exclusively against such offences as should be perpetrated upon females under the age of puberty or consent, and which do not rise to the enormity of forcible rape, for the want of one of the essential ingredients necessary to constitute that crime. This construction is amply sustained by the context, and indeed every other section of the statute. Under this view of the statute, wc are clear that a white girl, or white female, or white woman, are equally the subject of rape, and consequently of the attempt to commit that crime, and that therefore either description in an indictment would be all-sufficient for the purposes of the law. The indictment, and each of the counts, are therefore believed to be fully sufficient in law to uphold a conviction, if warranted in every other respect. This disposes of the points made upon the motion in arrest, and we will now proceed to the investigation of such as were presented upon the application for a new trial. The first point made relates to the admission of the declarations of the prisoner. We fully recognize the rule as laid down by the counsel for the defence. Confessions, to be admissible against a party, must be free and voluntary, and not drawn forth either by the flattery of hope or by the impression of fear. It is true that the accused was confined at the time he was interrogated, but it does not appear that any promises were made in case he confessed his guilt or that any threats were uttered against him in case of his refusal. The witness, who had no manner of control over him, and did not assume any, merely approached him and interrogated him, as it would seem, from sheer curiosity, and that, too, without any hope of favor on the one hand or any threat of punishment on the other. The confessions, under this state of case, cannot be said to be so much affected by any undue influence having been exerted upon his mind as to render them wholly incompetent. We conceive it to be a matter of little moment whether the confessions were admitted or not, as they tended to identify the defendant as the individual who entered the room where Miss Combs was sleeping, and who made the attempt upon her. This fact, we consider amply established by other testimony, and that as such his confessions are wholly immaterial to the merits of the case. The next question, and the one upon which the whole must turn, involves the sufficiency of the testimony to sustain the finding. Rape is defined to be the carnal knowledge of a female forcibly and against her will. In order to convict a party of the offence charged against the accused, it is essential to find the existence of the same intention, which, if carried out, and manifested by overt acts, would render him guilty of the crime of rape. The question here is, did his acts, on that occasion, manifest such intention or did they not ? In the solution of this question, we think that much light may be drawn not only from his own conduct, but also from the surrounding circumstances. There can be no doubt but that the time, place, and the attendant circumstances, are all material, as tending to fix and determine the real intention of the party. The substance of the testimony, as detailed by Miss Combs herself is, that, about 4 o’clock, in the morning, as she was lying asleep with four other little girls, she was awoke by some one who took hold of her by the shoulders and tried to turn her over, that she was lying with her face towards the other girls, that he made an effort to get over her, that she threw out her hand and discovered the person to be a man and partly undressed, that she then raised the alarm and called forjielp, that the instant she spoke he sprang to his feet,'that she then caught him by his pantaloons and tried to hold him, but that he seized her hand and wrung it loose, that she saw nothing more of him, but heard some person leave the room by going out at the door, that when the person took hold of her it was not in a rough but rude manner, that in attempting to turn her over he took hold of her knee. There was other testimony amply sufficient to identify the accused with the transaction. The question now to be determined, is, whether admitting all of these facts to be fully proven, he is guilty of the offence charged against him. In the case of Rex vs. Williams, (32 English Com. Law R. 524,) it was held that, in order to find a prisoner guilty of an assault with intent to commit a rape, the jury must be satisfied that the prisoner, when he laid hold of the prosecu-trix, not only desired to gratify his passions upon her person, but that he intended to do so at all events, and notwithstanding any resistance on ber part. In the case of The Comm. vs. Fields, a free negro, (4 Leigh 648,) which was an indictment for an attempt to ravish a white woman, the jury found a special verdict to the following effect, to wit: That the prisoner did not intend to have carnal knowledge of the female, as charged in the indictment, by force, but that he intended to have such carnal knowledge of her while she was asleep, that he made the attempt to have such carnal knowledge of her when she was asleep, but used no force except such as was incident to getting to bed with her and stripping up her night garment in which she was sleeping, and which caused her to awake. Upon that state of facts, the general court of Virginia was of opinion that he ought to have been acquitted. These cases are strongly in point. It is certain that the accused in this case used no force, nor is it probable, from all the surrounding circumstances, that the idea of force entered into his original design, and in case his intention was to effect his purpose while she was asleep, the authority cited shows that he is not guilty of the offence charged against him. We do not think that the testimony evinced that settled purpose to use force, and to act in disregard of vhe will of the prosecutrix, which the law contemplates as essential to constitute the crime. In respect to the instructions, the court ruled correctly in refusing to give the fourth and fifth. It was not necessary that the jury should have found the prosecutrix to have been a white woman, technically speaking, as proof that she was a white girl or a white female, would have been all-sufficient to satisfy the law. Under this construction of the term “ woman,” the 6th instruction was a mere abstraction, and consequently should have been excluded. We are satisfied, from a full view of the whole case, that the judgment of the circuit court was erroneous and ought to be reversed. The judgment of the circuit court of Hempstead county, herein rendered, is therefore reversed, and the cause remanded, with instructions to be proceeded in according to law, and not inconsistent with this opinion herein delivered.